UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAZARIS FULLER,

        Petitioner,

    v.

W. L. MUNIZ,

        Respondent.

Case No. 18-cv-06379-PJH

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY**

This is a habeas corpus case filed *pro se* by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and lodged exhibits with the court. For the reasons set out below, the petition is denied.

**BACKGROUND**

On August 18, 2014, a Contra Costa jury found petitioner guilty of kidnapping for sexual purpose (Cal. Penal Code § 209(b)(1)) and assault with intent to commit rape (Cal. Penal Code § 220(a))). Answer at 1. On October 10, 2014, in a bifurcated court trial of petitioner's prior offenses, the trial court found that petitioner had three prior convictions that were strike offenses and three prior serious felony convictions supporting an enhanced sentence. *Id.* He was sentenced to an aggregate term of 40 years to life in prison. *Id.* On March 27, 2017, the California Court of Appeal affirmed the judgment. *People v. Fuller*, No. A143419, 2017 WL 1131822 (Cal. Ct. App. 2017). The California Supreme Court denied review on July 12, 2017. Answer, Ex. 9.

The following summary of the evidence presented at trial is taken directly from the

opinion of the court of appeal affirming petitioner's judgment and conviction.[1]

A. *Prosecution Case*

On June 4, 2013, at around 5:00 a.m., Doe 1 was working as a prostitute in Richmond. [FN 3] A client had just bought her some food at the drive-thru window of a McDonald's restaurant. Doe 1 crossed the street, at the intersection of 23rd Street and Nevin Avenue. A short time later, she walked back to the McDonald's, hoping to use the restroom when the dine-in section of the restaurant opened. She stopped to check her makeup in the side mirror of a black truck, which was parked in the rear McDonald's lot. Doe 1 weighed 200 pounds and was five foot three inches tall. She was wearing a white dress and jacket, with pantyhose and sandals, but no underwear.

> FN 3: Doe 1 admitted two convictions, in 2007 and 2011, for felony theft. At the time of trial, she also had forgery charges pending against her.

Fuller approached Doe 1 from behind and asked to speak with her. She "told him no." She had seen Fuller "on the streets" about a month or several weeks before, when he had walked with her to the apartment complex where she lived. [FN 4] After Doe 1 refused Fuller's second request to talk to her, Fuller grabbed her by the hood of her jacket. Doe 1 grabbed onto the truck's side mirror and yelled and kicked, but Fuller successfully dragged her by the hood of her jacket across the parking lot, up to the restaurant's rear brick wall. She estimated the distance at about 35 feet. As Doe 1 was dragged toward the restaurant, the zipper on her jacket caught and cut her neck. Once Fuller stopped dragging her, Doe 1 was laying on the tiled sidewalk area between a recessed portion of the restaurant's rear wall and a garbage can. Fuller kicked and stomped on Doe 1 and then ripped her pantyhose completely off, by tearing them from her legs. Her sandals came off. Although Fuller never touched Doe 1's genitals or breasts, Fuller told her several times he was "going to get some whether [she] like[d] it or not."

> FN 4: Doe 1 said they talked for 20–30 minutes, but did not use drugs, discuss prostitution, or make any arrangement to exchange drugs for sex.

When a police officer arrived, Fuller ran, with the officer in pursuit. A second police officer and an ambulance arrived about five minutes later. Doe 1 suffered a cut on her neck, as well as abrasions to her neck and knee. Against the advice of the paramedics, she refused to go to a hospital.

---

[1] The court has independently reviewed the relevant portions of the record on which the state court based its judgment as required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Nasby v. Daniel*, 853 F.3d 1049, 1052–54 (9th Cir. 2017). Based on the court's independent review, the court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001), unless otherwise indicated in this order.

United States District Court
Northern District of California

1. *Police Investigation*

Around 5:08 a.m. on June 4, 2013, Richmond Police Department Officer Steve Harris was on patrol on 23rd Street, near the McDonald's, when he saw two uniformed employees of the restaurant waving and pointing toward the parking lot. He turned onto Nevin Avenue, but Harris was not able to see anything in the parking lot due to trees and parked cars along the street. As he drove into the McDonald's rear parking lot from Nevin Avenue, Harris heard a woman screaming. He could not initially see anything other than "two forms on the ground," but when he drove up to the area immediately behind the restaurant and his headlights illuminated the space, Harris saw a man kneeling above a woman, between her legs, to the left of a garbage can in a "darkened alcove." [FN 5] The man, later identified as Fuller, was "thrusting his hands into [the woman's] midsection." The woman's movement appeared to be restricted by Fuller's position above her torso, as well as her placement between the garbage can and the restaurant wall. Harris said the woman's legs were spread; her right leg was on the ground, but her left leg was in the air. Fuller was pulling something black from her. Initially, Harris thought it was blood, but it turned out to be Doe 1's pantyhose.

> FN 5: On cross-examination, Harris eventually conceded the restaurant had lights directly above the area where he found Doe 1 and Fuller. However, he insisted the area was darker than the surrounding areas, including the area by the black truck.

When Harris stepped out of his car, someone nearby yelled, "police," and Fuller ran. Harris gave chase, and Fuller was eventually taken into custody. When Harris returned to the McDonald's, Doe 1 told him that a man, later identified as Fuller, approached her, at 23rd Street and Nevin, and asked for her services as a prostitute. She refused because she thought Fuller had no money. [FN 6] Fuller slapped her bottom and she walked across the street to the McDonald's parking lot, stopping at the black truck to look in the mirror. Fuller followed her, slapped her bottom again, and told her, several times that she was "going to give [him] some," regardless of whether she wanted to. Doe 1 reported Fuller began to punch and kick her in the head, back, legs, and buttocks, and then dragged her from the truck to the spot where he ripped off her pantyhose. Fuller said, "you're going to do something with me whether you want to or not."

> FN 6: Doe 1 said she saw Fuller come out of a nearby crack house, but repeatedly told Harris she did not know Fuller. When she talked to a detective two weeks later, Doe 1 said her only prior contact with Fuller had been seeing him in the neighborhood.

Harris found black pantyhose, in six pieces, by the wall of the restaurant. By the black truck, Harris found an overturned soda cup, an uneaten hamburger, a headband, and a broken earring. Sixty-six feet was measured between the left, front corner of the truck and the spot where the ripped pantyhose was found.

2. *Uncharged Offenses Against Jane Doe 2*

Jane Doe 2, who also worked as a prostitute, testified at trial about an alleged assault Fuller committed against her 11 years before trial. [FN 7] On July 5, 2003, around dusk, Doe 2 met Fuller at an apartment building. He asked if she wanted to smoke crack cocaine. Doe 2 agreed to smoke crack with Fuller,

but did not agree to provide any sexual favors in exchange. They went to a portable toilet in a park to smoke. After smoking for about an hour, Fuller wanted sexual favors from Doe 2, but she refused. Fuller said, "You smoked my shit and now I ain't getting nothing for it." Fuller tried to force Doe 2 to orally copulate him. When she would not, "[h]e got mad. He beat me up. And he did things to me." After he "put his hands on [her]," Doe 2 did not remember anything else, besides "waking up naked outside" and speaking to a police officer. [FN 8]

> FN 7: Doe 2 admitted she had been convicted of driving a stolen car and previously gave false information to a police officer. At the time of Fuller's trial, she was on probation, with probation violation proceedings pending.

> FN 8: She did not remember what she told the police officer. It was stipulated that Doe 2 refused to submit to a vaginal rape examination and that a urine sample collected from Doe 2 showed the presence of cocaine, cocaine metabolite, and marijuana.

On cross-examination, Doe 2 was asked if she remembered Fuller having intercourse with her. She responded, "I do not have know [*sic*] memory of him doing it, but I had—I mean, you could tell when something has happened to you after ...." She did not remember taking off her clothes, even when shown a police photograph of a shirt draped over a rail inside the portable toilet. Doe 2 admitted she spoke to Fuller's defense attorney, a few months prior to trial, and had lied to him. Doe 2 also testified previously, at a pretrial Evidence Code section 402 hearing. At that time, she testified she remembered being hurt by Fuller, but didn't remember much else, other than waking up in a hospital. In fact, she remembered more than she had stated previously. She lied because she was "frustrated," did not want to be in court, and "felt really small."

Doe 2's prior statements to Richmond Police Officer Jerred Tong were admitted under the spontaneous statement hearsay exception. (Evid. Code, § 1240.) Tong testified that, on July 6, 2003, at around 12:30 a.m., he was at Kennedy Park when he heard "some wrestling or struggling" coming from a portable toilet. Fuller ran out of the toilet, with his penis hanging out of his pants. Then Doe 2 fell out, wearing only underwear. She was crying hard, but was able to tell Tong she met Fuller at Bayview Market, around dusk, and walked to Kennedy Park and entered a portable toilet with him. [FN 9] Once inside, Fuller offered her crack cocaine. She refused and walked out. Fuller ran after her, knocked her to the ground, hit and kicked her, and told her, "You owe me money for the crack I bought you." Fuller dragged her back to the portable toilet, where he demanded oral sex "because [she] owed [him] money for the crack [he] bought." She refused. Fuller pushed Doe 2 to the ground, put his penis in her mouth, and she orally copulated him. Fuller then ripped off most of her clothes, rubbed his penis on her breasts, and had intercourse with her.

> FN 9: On cross-examination, Tong said Doe 2 told him Fuller lived "in someone's garage on South 47th Street or South 49th Street," but she did not explain how she knew.

Richmond Police Officer Joanna Grivetti also responded. Grivetti said Doe 2 was emotionally upset, said she had been raped inside a portable toilet, and had scrapes, swelling, cuts, and bruises on her body. Grivetti found a bra and

jeans on the floor of the toilet, as well as a shirt hanging on the toilet's railing.

Fuller was never charged with any crime against Doe 2. However, in connection with civil litigation arising out of Fuller's 2003 arrest, an attorney took Fuller's deposition. During that deposition, Fuller admitted meeting Doe 2, on July 5, 2003, and smoking crack with her in several locations. Fuller said he and Doe 2 spent several hours at a friend's house, had sex at another apartment, and then, at about 11:30 p.m., went to a park to buy more crack. Fuller denied raping Doe 2. According to him, Doe 2 smoked all of his crack inside a portable toilet, and when she refused to pay her share, Fuller hit her. He stopped hitting her when she began to cry and then he rubbed his penis against her breasts. Fuller said he ran from the police because he thought they would assume he had raped Doe 2, as he had "just beat her up" and she was partially undressed and crying.

B. *Defense Case*

In his defense, Fuller called a paramedic who examined Doe 1, on June 4, 2013, and found abrasions on her neck and left knee. Doe 1 did not report having been dragged by her jacket, but said Fuller grabbed her neck.

A private investigator, Edwin Stein, testified about photographs he took, at night on August 11, 2014, of the area around the McDonald's. According to Stein, there was more light under the McDonald's overhang, where Harris purportedly saw Doe 1 and Fuller, than in the parking lot area where the black truck had been parked.

Another private investigator, Jason DeWitt, twice spoke to Doe 2. Initially, Doe 2 said she had been riding in a car with some friends on July 5, 2003, went to use a portable toilet in a Richmond park, and was then hit from behind with a bottle. She did not see her assailant and could not describe him. When he spoke to Doe 2 on a second occasion, she said she had no memory of what occurred.

Fuller testified, in his own defense, that he was five feet three inches tall and weighed approximately 150 pounds. [FN 10] He had met Doe 1 before June 4, 2013. In May 2013, he saw her frequently at a bus stop as he walked to a drug treatment program. On one occasion, five or six days before June 4, Doe 1 offered to provide sex in exchange for drugs. Fuller knew she was a prostitute and agreed. They walked to the steps of her apartment building and smoked methamphetamine Fuller provided. Doe 1 allowed Fuller to kiss her breasts. Doe 1 began to hallucinate and told Fuller not to touch her. Fuller complied, but was angry. He testified: "I couldn't believe [she was] smoking up my drugs and not honoring her end of the deal. It made me upset. ... I started to snatch the pipe but eventually I ended up walking away."

> FN 10: Fuller had prior convictions for robbery and burglary.

When Fuller approached Doe 1 five or six days later, on June 4, 2013, she acted as if she did not know him. Fuller asked, "You not going to finish what you started as far as handling your business, what we started ... ?" Doe 1 said, "[n]o" and walked across the street, to a pickup truck in the McDonald's parking lot, and continued to ignore Fuller. He was angry; Fuller believed she was "tak[ing his] kindness for weakness." Fuller followed Doe 1, but she continued to ignore him. After warning her that it was "going to get real ugly if [she did not] listen to what [he had] to say," he hit her arm and leg.

5

Fuller did not intend to rape Doe 1, and did not say he was going to rape her. He only wanted to beat her up. [FN 11] He did not drag her from the pickup truck to the restaurant. Rather, Fuller struck Doe 1 and pulled on the hood of her jacket, while she grabbed onto the truck's side mirror and squatted down. He pulled on her legs in an attempt to get her to stand up. Fuller denied ripping off Doe 1's pantyhose. When Fuller saw a police car, he ran.

> FN 11: On cross-examination, Fuller admitted telling a police officer, immediately after he was arrested, that Doe 1 "owed him some pussy" and that "[he] first wanted to fuck her because she owed [him] that, but as [he] was beating her up, she smelled like piss, so [he] didn't want to fuck her no more." Fuller said what he really meant was that he had wanted to have sex with Doe 1 at some private place, not in the McDonald's parking lot.

Fuller also admitted meeting Doe 2, in 2003, at Kennedy Park. He asked Doe 2 if she wanted to get high. She agreed to smoke cocaine with Fuller and he believed there was "a little chemistry" between them. They walked to a friend's house and smoked crack in the friend's converted garage apartment. They did not have sex there, but they were affectionate and Fuller learned Doe 2 was a prostitute. They left the friend's house around 7:30 or 8:00 p.m., and went to another house. There, Doe 2 and Fuller smoked more crack and had consensual sex. As Fuller's crack supply diminished, they left to buy more. Doe 2 agreed to engage in prostitution to obtain more crack. But when they reached Kennedy Park, Doe 2 said she wanted to go to her mother's house to get money. Fuller thought she was trying to avoid paying her share. They argued and Doe 2 slapped Fuller. He responded by "beat[ing] her up"— slapping Doe 2's face and punching her arms and body multiple times. Fuller eventually stopped "[b]ecause [he] felt bad and [he] knew [he] was a lot stronger than her and she was crying."

Fuller apologized to Doe 2 and she calmed down. He bought more crack, which they were unable to smoke outside because it was too windy. They went inside a portable toilet, where they smoked crack for another 45 to 60 minutes. During that time, Doe 2 removed her blouse, pants and shoes, but kept her underwear on. According to Fuller, Doe 2 removed her pants because they were going to have intercourse. When they realized Fuller did not have a condom, they stopped. Doe 2 allowed Fuller to rub his penis on her breasts.

Fuller did not hit Doe 2, rape her, or force oral sex while they were inside the toilet. Nonetheless, when Fuller saw a police car pull up outside, he fled. He ran because he had cocaine in his pocket and a parole warrant. Further, because Doe 2 was Caucasian, Fuller believed most officers would think he raped her.

C. *Instructions and Closing Argument*

Regarding the 2003 incident, the trial court instructed the jury, pursuant to CALCRIM No. 1191, that it could consider evidence of uncharged sexual offenses, if proved by a preponderance of the evidence, to conclude Fuller was likely to have committed the charged acts. [FN 12] The court also instructed the jury on the elements of rape (Pen. Code, § 261; CALCRIM No. 1000) and sexual battery (Pen. Code, § 243.4; CALCRIM 1191).

FN 12: The jury was instructed: "The People presented evidence that in 2003 [Fuller] may have committed a rape and/or a sexual battery that was not charged in this case. [¶] This is in reference to the [Doe 2] occurrence in 2003. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that [Fuller], in fact, committed the uncharged sexual assault. [¶] So in this particular case, remember I talked about proof beyond a reasonable doubt. And when I say prove something, it always means proved beyond a reasonable doubt. This is the exception to that statement that I referred to earlier. Because with respect to evidence relating to [Doe 2], you will be permitted to consider that evidence for the purposes I'm going to describe, if you find by a preponderance of evidence that the prior occurrence took place. [¶] Proof by a preponderance of the evidence is a different burden of proof than [proof] beyond a reasonable doubt. A fact is proved by a preponderance of evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, then you must disregard this evidence entirely. [¶] If you decide that [Fuller] committed the uncharged sexual assault, you may, but are not required, to conclude from that evidence that [Fuller] was disposed or inclined to commit sexual assault offenses, and based upon that decision, also conclude that [Fuller] was likely to commit the two crimes charged in this case. If you conclude that [Fuller] committed the uncharged offense or offenses, that conclusion is only one factor to consider along with all of the other evidence. Proof of an uncharged sexual assault is not enough by itself to prove that [Fuller] is guilty of the two crimes charged in the Information. The People must still prove each of these charges beyond a reasonable doubt."

During closing argument, defense counsel contended Fuller committed only a simple assault against Doe 1, next to the parked truck, in retaliation for reneging on their bargain. Fuller claimed he had no intent to rape Doe 1 during the attack, nor did he move her across the parking lot. Rather, the defense claimed that Doe 1 and Harris lied, and moreover, that Doe 1 planted the pantyhose evidence during the time she was alone at the scene. Likewise, Doe 2 lied about the 2003 allegations.

*Fuller*, 2017 WL 1131822 at *1–*6.

## ISSUES

Petitioner asserts the following four claims for federal habeas relief: (1) the trial court erred in overruling objections to the prosecutor's peremptory challenges to African-American jurors; (2) there was insufficient evidence to support the conviction for aggravated kidnapping; (3) the trial court erred by failing to instruct the jury that a reasonable but mistaken belief in consent to rape could be a defense to the uncharged bad act; and (4) the trial court erred by not instructing the jury regarding petitioner's unrecorded out of court statements to police.

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell ("Miller-El I")*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412–13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409. Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El I*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

The state court decision to which § 2254(d) applies is the "last reasoned decision"

8

of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). The final state court decision from the California Supreme Court summarily denied the petition for review. The California Court of Appeal was the last reasoned state court decision that addressed the claims raised by petitioner. Accordingly, in reviewing this habeas petition, this Court reviews the California Court of Appeal's decision. *See Ylst*, 501 U.S. at 803–04; *Barker*, 423 F.3d at 1091–92.[2]

**DISCUSSION**

**I.** ***Batson* Claim**

Petitioner asserts a claim under *Batson v. Kentucky*, 476 U.S. 79, 85 (1986), that the trial court erred in overruling objections to the prosecutor's peremptory challenges to two African-American prospective jurors in violation of the Equal Protection Clause.

**A. State Court Denial of *Batson* Claim**

The California Court of Appeal denied the *Batson* claim as follows:

A. *Racial Discrimination in Jury Selection*

Fuller first maintains the trial court erred in rejecting his *Batson/Wheeler* [FN 13] objections to the prosecutor's peremptory challenge of two African–American prospective jurors (M.F. and M.K.). Fuller asserts the trial court "failed to discharge [its] duty to review carefully whether the prosecutor's true motivation was group race bias." We disagree.

> FN 13: *Batson v. Kentucky* (1986) 476 U.S. 79, 84–89, 95–96 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 (*Wheeler*).

The California and United States Constitutions forbid a prosecutor from excluding prospective jurors from a jury for a racially discriminatory purpose. (*Batson, supra*, 476 U.S. at pp. 84–89, 95–96; *Wheeler, supra*, 22 Cal.3d at pp. 276–277.) "The now familiar *Batson/Wheeler* inquiry consists of three distinct steps. First, the opponent of the strike must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference

---

[2] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker*, 423 F.3d at 1092 n.3 (citing *Lambert v. Blodgett*, 393 F.3d 943, 970 n.17 (9th Cir. 2004), and *Bailey v. Rae*, 339 F.3d 1107, 1112–13 (9th Cir. 2003)). The look through rule is applicable here as the Ninth Circuit has held that "it is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is 'contrary to' or 'an unreasonable application of' clearly established federal law" and "it [is] unlikely that the Supreme Court intended to disrupt this practice without making its intention clear." *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

of discriminatory purpose in the exercise of peremptory challenges. Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination." (*People v. Scott* (2015) 61 Cal.4th 363, 383; accord, *Johnson v. California* (2005) 545 U.S. 162, 168.) "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike." (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613 (*Lenix*).) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.)

1. *Background*

Jury selection took place over the course of six days. During jury selection, the People exercised 15 of their 20 peremptory challenges, while Fuller exercised 18. The People peremptorily challenged four of the five African–American jurors called to the jury box. The jury that was sworn, excluding alternates, was composed of seven Caucasians, two Hispanics, two Asians, and one African–American.

M.F.'s voir dire questionnaire indicated he was African–American and a retired electrical engineer and physicist, who served three years in the Army. He also indicated his view that prostitution should be legalized, adding, "I was a soldier." M.F. had been previously accused of "using profanity in city limits." When asked by the court about the accusation, M.F. said, "Crooked white cops jumping down on young blacks back in 1962. [¶] ... [¶] I was in an Army uniform and I married a dutch lady. And I think—blonde hair, blue-eyed lady sitting next to me ... was more than he could take. [¶] So we ... actually got run off the road. And instead of him going after the people that ran us off the road, he came over to find out who I was and who I was with and so on. ... I went to jail and when I showed up in court, he didn't show so that was the end of it." M.F. denied the 1962 experience would have any influence on him in this case. He would not automatically disbelieve a police officer.

In the portion of the questionnaire asking his opinion of the veracity of women who report rape, he indicated "most of them" are telling the truth and commented, "Tell Boston cops a Black guy did it." Regarding how frequently police officers tell the truth, M.F. did not answer the question and wrote, "I don't know that many. Crooked cops." The questionnaire also asked: "Have you ever had any positive or negative experiences with police officers or other law enforcement agents?" M.F. answered in the affirmative, stating, "I'm Black!" The court asked M.F. if this response was based solely on his experience in 1962. M.F. said, "It started way before then when I was in high school. I was the only black in Laguna Beach with a convertible. I started driving when I was 16. And that's when I really ran into a lot of problems." When asked if he could put those experiences aside and decide Fuller's case on its own merits, M.F. responded: "Everything has changed. There [are] good [police officers], there [are] bad ones, and there are more good ones now than bad ones." M.F. also said he would not look at Fuller any differently because of his race.

The prosecutor also had the following colloquy with M.F.:

"[PROSECUTOR]: On your questionnaire, ... start with [question] 38, that's ... where they ask you to say [if] police officers tell the truth always, more than most people, a couple other levels there. And you wrote down crooked cops ... after you said you don't know that many. [¶] ... Was there anything other than ... your experience in high school and the incident back in ... 1962, was there anything in particular that you are thinking about?

"[M.F.]: No. That's about the only interface that I have ever had.

"[PROSECUTOR]: So there is nothing that police officers have done to you since 1962?

"[M.F.]: No.

"[PROSECUTOR]: That makes you think police officers are crooked?

"[M.F.]: No.

"[PROSECUTOR]: You are not surprised something like that happened, are you?

"[M.F.]: Oh, no, no. Especially in 1962, actually not surprised at all.

"[PROSECUTOR]: I guess I will talk about my concerns. My concerns are that I know this must have influenced you back then. I know you are telling the Judge, I believe you that you don't think that would have an effect on you now that you deliberate. My concern, again, is about subconscious bias, you know, I had this experience, and when you do go back to the jury room, you might be think [ing] about it in the back of your mind or not even realize you are thinking about it. Is that something I should be concerned about?

"[M.F.]: No, no. Things have changed so much, so that's in the past, but it did happen.

"[PROSECUTOR]: I absolutely believe you."

The prosecutor exercised a peremptory challenge to remove M.F. from the jury, and the court denied Fuller's *Batson/Wheeler* motion. Defense counsel argued: "[T]he problem with [M.F.] is ... he's [an] African–American male and the previous excusal was an African–American male [ (J.J.) ]. And there was a previous excusal of a woman who identified herself as 50 percent African–American [ (O.B.) [FN 14]]. [¶] [M.F.] talked about incidents that happened in 1962 and earlier and stated that that was a different time different era and that he actually felt that most cops were good at this time. And otherwise there was no reason in his questionnaire answers to excuse him. He seemed like a responsible citizen. [¶] And so, therefore, I don't believe that the [prosecutor's peremptory] challenge is justified." Defense counsel also noted that, at that time, three African–American males and five African–American females remained in the venire panel.

> FN 14: Only the excusal of M.F. was subject to Fuller's *Batson/Wheeler* challenge. At the time of Fuller's motion, the trial court indicated, "The other jurors [ (J.J. and O.B.) ] are only relevant insofar as there is an indication of a pattern of excusing all of the African–American jurors." In his opening brief, Fuller concedes his trial counsel

raised no *Batson/Wheeler* challenge to J.J. or O.B. Accordingly, Fuller forfeited any *Batson/Wheeler* argument specific to those two prospective jurors. (*People v. Avila* (2006) 38 Cal.4th 491, 552 [defendant has burden to clarify *Batson/Wheeler* challenges]; *People v. McDermott* (2002) 28 Cal.4th 946, 969.)

As far as we can tell from the record before us, [FN 15] the court did not rule on whether Fuller presented a prima facie case of discrimination, and instead invited the prosecutor to state reasons for the challenge. The prosecutor said, "So for [M.F.] ... when you look at his questionnaire, there are a number of things that concern me as a [p]rosecutor that had nothing to do with the fact that his skin was black. He talked about ...." At this point, the trial court interjected, "Pretty hard to divorce his answers from his ethnicity because the answers that concerned you have everything to do with his ethnicity." The prosecutor continued: "That is correct. [¶] ... [¶] What he indicated on his questionnaire that he had positive or negative experiences with police officers or law enforcement agencies. He ... wrote, I'm black, with an exclamation point. [¶] He talked about in 1962 in Santa Ana he had an experience with a police officer and he thought the police officer in essence was being racist. And ... because of that, he had a real problem with police, certainly back then. [¶] He also talked about how in high school he was the only African–American with a convertible and that caused him a number of problems as it relates to police officers. [¶] ... [¶] I understand it was in 1962, but my concern is that he put on numerous spots in his questionnaire that he had problems with the police. [¶] Again, question No. 38, he talked about police officers and he said 'crooked cops.' [¶] So I have some very legitimate concerns about whether or not he's really put that in the past. I know he said that he has put it in the past, but I can't rely on that. [¶] I have an essential witness who is a police officer who is an eye witness to this attempted rape and his credibility is going to be absolutely at issue. If I have a juror who by indications on his questionnaire thinks police are crooked and may lie and may make race-based decisions, especially for a defendant who is African–American, it bodes poorly for my case."

> FN 15: It appears Fuller's *Batson/Wheeler* objection was first discussed during an unreported sidebar conference.

The trial court denied the motion, explaining, "I denied the motion already. ... I have not heard anything [that] would cause me to change my position. [M.F.] is a unique person, who is somebody who is an African–American male who is a physicist, who according to what he says, worked at least at one aerospace company at which he had a top secret clearance or some kind of security clearance. He clearly is a unique individual, to say the least. [¶] On the other hand, [the prosecutor's] *reasons for excusing him ... are plausibly valid. I think all that I am required to do is find that there is a non-plausible* [*sic*] *non-discriminatory reason for the exercise* of the particular challenge in question. And the various points in the questionnaire that [the prosecutor] point[s] out with respect to [M.F.'s] answers ... objectivity might call into question whether or not somebody's representations that they have put all of these things in the past and it wouldn't affect them now in the present could raise a legitimate question. ... I think that's all that I am required to decide here. [¶] *I don't think I'm required to decide whether or not* [*M.F.*] *is, in fact, not telling us what he honestly in his heart believes are the case.* [FN 16] [¶] The question is, is there an objective basis for the ... exercise of the challenge? And it seems to me there is." (Italics added.)

12

FN 16: At oral argument on appeal, Fuller's counsel initially argued this sentence was a declaration by the trial court that it need not determine the genuineness of the prosecutor's stated justifications for excusing the juror. Counsel subsequently agreed the comment only referenced M.F.'s voir dire answers.

M.K.'s voir dire questionnaire indicated she was African–American and a retired preschool director. Her husband was a retired professor of urban planning, who previously worked as an attorney—initially for the Alameda County District Attorney and later for legal aid. The court asked M.K. for further information about her husband's time in the district attorney's office, but she could provide little other than "[i]t was when Ed Meece [*sic*] was in the office." The court asked, "So your husband was a staunch Republican then?" She responded, "No, no, no, no." Her questionnaire also indicates she donated to the American Civil Liberties Union (ACLU), Mothers Against Drunk Driving, and the Southern Poverty Law Center.

M.K.'s youngest son had been accused, when he was a teenager, of "breaking into cars." M.K. said her son's legal trouble occurred 25 years ago and her son was doing fine now. There was nothing about the experience that caused her concern about her ability to be impartial and further explained, "I don't actually know a lot about it because he wasn't living with me at the time and [he] didn't want his mother to know that he was in trouble. [¶] ... [¶] ... But I think he was sentenced to an open detention center, not a prison prison." She further indicated this same son suffered substance abuse problems, but had been sober for a year and a half. M.K. wrote in her questionnaire she objected to the death penalty and believed prostitution should be legal. She also indicated she had been sexually abused as a child and believed most women who report rape are telling the truth. M.K. denied her abuse history would have any influence on her as a juror. M.K. had been on two prior juries, and in one instance she served as foreperson.

The prosecutor also had the following colloquy with M.K.:

"[PROSECUTOR]: Did [your husband] ever talk about why he ended up leaving the District Attorney's Office?

"[M.K.]: He wanted to change professions and do something that would be more proactive, I think, is how he put it.

"[PROSECUTOR]: I guess going from district attorney to legal aid is kind of a big switch prosecuting criminals and the other one is helping people through legal aid.

"[M.K.]: Right. [¶] ... [¶]

"[PROSECUTOR]: You donate to the ACLU.... I know ACLU covers a whole range of things, some people have very specific things they want to donate for ... in particular?

"[M.K.]: No.

"[PROSECUTOR]: Just in general?

"[M.K.]: Yes. I have been doing it for years." Defense counsel had no questions for M.K.

13

The prosecutor exercised a peremptory challenge to remove M.K. from the jury, and the court denied Fuller's *Batson/Wheeler* motion. The following record was made:

"[DEFENSE COUNSEL]: ... [M.K.] appeared to be well qualified, ... she had served twice on juries in the past including once as a foreperson, however, she's African–American.

"THE COURT: Okay. Mr. [Prosecutor].

"[PROSECUTOR]: Yes. [¶] My excusal had nothing to do with her race. As a [prosecutor], I do not like to keep teachers as a general rule or people who deal with children because—

"THE COURT: Do you have any kids?

"[PROSECUTOR]: I do.

"THE COURT: So you don't like them as jurors?

"[PROSECUTOR]: As jurors. [¶] And I also don't prefer to have jurors on there who are somewhat in the ivory tower, that overthink[ ] things. [¶] I also do not want jurors on there who tend to have a liberal point of view. And this particular juror, based on herself and her husband and her experiences, seemed to have a very liberal point of view. Her husband is a professor, although he started out as being a district attorney, he obviously did not like that.

"THE COURT: We don't know if he was a district attorney or not—[M.K.] was not clear on anything other than the fact she thought he worked in the District Attorney's Office. But there are positions in the District Attorney's Office that are not necessarily attorney positions.

"[PROSECUTOR]: True. [¶] Her husband is a professor, she donates to the ACLU. She's liberal. I'm sure [defense counsel] belongs himself—

"[DEFENSE COUNSEL]: I would make a much better juror.

"[PROSECUTOR]: She does not favor the death penalty, which obviously is a very liberal point of view. She donates to the [Southern Poverty Law Center].

"THE COURT: It's the same point of view that around 50 percent of the rest of California entertains. .... [Y]our point is?

"[PROSECUTOR]: She [is] donating to the [Southern Poverty Law Center]. All great things, but not as a juror. This is not a pro law enforcement position. [¶] At one point the Judge asked her if her husband was a republican, to which she audibly laughed.

"THE COURT: After she mentioned Ed Meece [*sic*].

"[PROSECUTOR]: This is someone who has a liberal point of view. Her husband worked for legal aid. [¶] I was also concerned that she was a foreperson on a prior jury similar to this. There is a very good chance that this

very liberal woman, who has a husband who is a professor, she's a teacher who works with children, is going to be the foreperson of this jury which is, again, great cause for concern for me.

"She wanted to legalize prostitution in her questionnaire. Her son was convicted of breaking into cars, although, in all candor, that seemed quite some time ago. I wasn't particularly concerned about the son breaking into cars, but her son also having a substance abuse problem which she said, if I recall correctly, kind of parlayed to something perhaps a criminal issue. It's also an issue in the case the defendant was using drugs .... Whether she was white, purple or green has nothing to do with the color of her skin.

"THE COURT: If she were green, we might have additional questions about her medical condition. [¶] ... [¶] In any event, *the standard here is not whether or not I agree or disagree with a particular peremptory challenge, but whether or not there is a plausible non-discriminatory reason* for the exercise of the challenge and the Court's views in deference to the excusal of [M.K.], *the People have articulated a plausible, rational and non-discriminatory justification* for her excusal. So, therefore, that's why I did not sustain the objection." (Italics added.)

2. *Analysis*

When, as happened in this case, "a trial court solicits an explanation of the strike without first declaring its views on the first stage, we infer an "implied prima facie finding" of discrimination and proceed directly to review of the ultimate question of purposeful discrimination." (*People v. Scott, supra,* 61 Cal.4th at p. 387, fn. 1.) " ' "[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination ... , the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation ...." ' (*People v. Silva* (2001) 25 Cal.4th 345, 384.) 'The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific, race- or group-neutral explanation related to the particular case being tried. [Citations.] The justification need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice.' (*People v. Arias* (1996) 13 Cal.4th 92, 136.) A prospective juror may be excused based upon bare looks and gestures, hunches, and even arbitrary reasons. (See *People v. Turner* (1994) 8 Cal.4th 137, 165, 171.) ... As noted in *Wheeler*, 'even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust of a juror's objectivity on no more than the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another" [citation]—upon entering the box the juror may have smiled at the defendant, for instance, or glared at him.' (*Wheeler, supra,* 22 Cal.3d at p. 275.)" (*People v. Allen* (2004) 115 Cal.App.4th 542, 547.)

"When the trial court has found a prima facie case, and the party exercising the peremptory challenges has stated a race-neutral reason for each challenge, 'the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.' (*Purkett v. Elem* (1995) 514 U.S. 765, 767; [citation].) The trial court's ruling on this issue is reviewed for substantial evidence. [Citation.] But we apply this deferential standard of review only when 'the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror.' " (*People v. McDermott, supra,* 28 Cal.4th at p. 971; accord, *People v. Williams* (2013) 56 Cal.4th 630, 650.)

Fuller contends the trial court's ruling is entitled to no such deference because, as purportedly shown by the italicized language above, the trial court did not make a sincere and reasoned attempt to evaluate the prosecutor's explanation of challenges to M.F. and M.K. Fuller's argument is premised on the assumption that "[i]t was not sufficient for the trial judge to opine the prosecutor's reasons were 'plausible' "; rather the trial court must make an express credibility finding or an express finding that racial discrimination played no role.

"The existence or nonexistence of purposeful racial discrimination is a question of fact." (*People v. Lewis* (2008) 43 Cal.4th 415, 469, disapproved on other grounds by *People v. Black* (2014) 58 Cal.4th 912, 919–920.) "On appeal, '[w]e review a trial court's ruling at step three for substantial evidence.' (*People v. Watson* (2008) 43 Cal.4th 652, 671.) Trial judges have a superior vantage point in hearing and seeing both the prospective jurors' demeanor in answering questions and the manner in which prosecutors exercise peremptory challenges, and their express and implied factual determinations based on these personal observations are accordingly owed deference by appellate courts that review merely the recorded transcript of the proceedings. (Cf. [*People v. Reynoso* (2003) ] 31 Cal.4th 903, 926; *Lenix, supra,* 44 Cal.4th 602, 613–614; contra, *People v. Alvarez* (1996) 14 Cal.4th 155, 198, fn. 9.)" (*People v. Long* (2010) 189 Cal.App.4th 826, 842–843.) At stage three, " 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.' [Citation.] In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 339.) However, " '[w]hen the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.' " (*People v. McDermott, supra,* 28 Cal.4th at p. 980.)

In attempting to persuade us that the trial court is required to make express findings on the ultimate issue, Fuller contrasts the record before us from that in cases in which such findings were expressly made. (See *People v. Winbush* (2017) 2 Cal.5th 402, 435, 436, 438, 441; *People v. DeHoyos* (2013) 57 Cal.4th 79, 103–105, 108, 115.) That express findings have been made in some cases says nothing about whether or not they were required to be made here. In fact, the authority is to the contrary. " ' " '[T]he trial court is *not* required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine.' " ' " (*DeHoyos*, at p. 102, italics added; *People v. Vines* (2011) 51 Cal.4th 830, 849.) " 'Although we generally "accord great deference to the trial court's ruling that a particular reason is genuine," we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror.' (*People v. Silva*[*, supra,*] 25 Cal.4th [at pp.] 385–386.) 'When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient.' (*Id.* at p. 386.)" (*People v. Williams, supra,* 56 Cal.4th at p. 653; accord, *People*

*v. Long, supra,* 189 Cal.App.4th at p. 842; see *Miller–El v. Dretke* (2005) 545 U.S. 231, 251–252 ["the rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the *plausibility* of that reason in light of all evidence with a bearing on it" (italics added) ].)

This case is nothing like *People v. Silva*, in which our Supreme Court held the trial court failed to make a sincere and reasoned determination of the genuineness of the prosecutor's proffered explanations. (*Silva, supra,* 25 Cal.4th at p. 385.) The *Silva* court reached this conclusion because the prosecutor gave reasons that were not supported by voir dire. (*Id.* at pp. 376– 377, 385–386.) Specifically, the prosecutor quoted a misleading portion of a prospective juror's answers concerning the death penalty, and the trial court failed to point out the inconsistencies or ask probing questions. (*Id.* at p. 385.) "Although an isolated mistake or misstatement that the trial court recognizes as such is generally insufficient to demonstrate discriminatory intent [citation], it is another matter altogether when ... the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge and the trial court has failed to probe the issue [citations]." (*Ibid.*) No deference was justified because nothing in the record suggested the trial court "was aware of, or attached any significance to, the obvious gap between the prosecutor's claimed reasons for exercising a peremptory challenge against [a prospective juror] and the facts as disclosed by the transcripts of [the prospective juror's] voir dire responses." (*Ibid.*)

Here, in contrast, the trial court asked probing questions, showed its familiarity with the voir dire record, and the prosecutor's stated race-neutral reasons for exercising peremptory challenges against both M.F. and M.K. were plausible and supported by the record. [FN 17] We can infer the trial court found no race discrimination.

> FN 17: Thus, this case is also distinguishable from *People v. Fuentes* (1991) 54 Cal.3d 707, in which the prosecutor excused 14 African– American jurors. The trial court in *Fuentes* failed to satisfy its inquiry and evaluation obligations because it globally found some of the prosecutor's stated reasons genuine and some "spurious," but failed to consider which reasons applied to which jurors. (*Id.* at pp. 711–713, 718–720.) "[A] truly 'reasoned attempt' to evaluate the prosecutor's explanations [citation] requires the court to address the challenged jurors individually to determine whether any one of them has been improperly excluded. In that process, the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." (*Id.* at p. 720.)

The prosecutor justified his challenge of M.F. based on M.F.'s negative perceptions of law enforcement, particularly his view that police officers made race-based decisions. M.F., in his questionnaire and oral voir dire responses, clearly expressed his negative views of law enforcement, particularly with respect to law enforcement's treatment of African–Americans. A prospective juror's negative view of the police is a legitimate race-neutral reason for a challenge. (*People v. Jones* (2013) 57 Cal.4th 899, 918.) Despite Fuller's unsupported protestations, even when that negative view relates to how African–Americans are treated by police, this is a view not restricted to African–American individuals and a valid reason for a challenge, not a proxy for race. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 70, disapproved on

other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Calvin* (2008) 159 Cal.App.4th 1377, 1381, 1386, 1388.) The prosecutor and the trial court also recognized that, during oral voir dire, M.F. indicated he could be fair and impartial despite his past experiences. M.F.'s experiences with police, his repeated references to "crooked cops," and his additional comment that victims of rape need only tell police an African–American did it, would at least reasonably give a prosecutor pause in this case, even if M.F. later said much had changed since 1962. Because the prosecutor's race-neutral reasons were supported and plausible, the trial court was not required to further question the prosecutor or make detailed findings. (*People v. Reynoso, supra,* 31 Cal.4th at p. 926; *People v. Allen, supra*, 115 Cal.App.4th at pp. 547–548.)

Furthermore, at the time the prosecutor challenged both M.F. and M.K., another African–American juror (Juror No. 16) remained on the panel. Juror No. 16 ultimately served on the jury. Although the prosecutor's passing of other African–American jurors is not conclusive, it is a factor indicating good faith. (*People v. Cornwell*, *supra,* 37 Cal.4th at pp. 69–70, *People v. Turner, supra,* 8 Cal.4th at p. 168; *People v. Snow* (1987) 44 Cal.3d 216, 225.) Under our deferential standard of review, the trial court did not err in denying Fuller's *Batson/Wheeler* motion with respect to M.F.

The prosecutor attributed his challenge of M.K. to her former profession and her liberal tendencies, which were evidenced by her charitable donations, her views on the death penalty and prostitution, her staunch denial that her husband was a republican, and statements that her husband had left a job at a district attorney's office for a "more proactive" role at Legal Aid. A prospective juror's occupation or spouse's occupation, as well as a prospective juror's liberal tendencies are permissible, nondiscriminatory reasons for exercising a peremptory challenge. (*People v. Jones, supra*, 57 Cal.4th at p. 919; *People v. Rushing* (2011) 197 Cal.App.4th 801, 811–812; *People v. Barber* (1988) 200 Cal.App.3d 378, 394 [permissible to challenge teacher based on belief teachers are liberal].) The prosecutor also stated he was worried about M.K.'s son's legal and substance abuse troubles, which might make her more sympathetic to Fuller. " '[A] close relative's adversary contact with the criminal justice system might make a prospective juror unsympathetic to the prosecution.' " (*Jones,* at p. 920.)

For the first time on appeal, Fuller seeks to challenge the prosecutor's explanations for excusing M.K. by asking us to engage in comparative juror analysis. (See *Miller-El v. Dretke, supra,* 545 U.S. at p. 241 [if "prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*' s third step"].) He points out that Juror No. 18, who identified herself as Caucasian, was also a teacher and was passed by the prosecutor.

"[W]hen the defendant relies on [evidence of comparative juror analysis] and the record is adequate to permit the comparisons[,] ... comparative juror analysis must be performed on appeal even when such an analysis was not conducted below." (*Lenix, supra,* 44 Cal.4th at p. 607; accord, *People v. O'Malley* (2016) 62 Cal.4th 944, 977.) "At the same time, 'we are mindful that comparative juror analysis on a cold appellate record has inherent limitations.' [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance

involved. 'Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.' " (*People v. Taylor* (2009) 47 Cal.4th 850, 887.) "In conducting this inquiry, we [also] bear in mind that comparative juror analysis is not simply an exercise in identifying any conceivable distinctions among prospective jurors. ... Rather, because the ultimate question before us concerns the prosecutor's motivations in exercising the challenge in question, we must ask whether there were any material differences among the jurors—that is, differences, other than race, that we can reasonably infer motivated the prosecutor's pattern of challenges." (*O'Malley,* at p. 977, italics omitted.)

Even if Juror No. 18 shared some characteristics with M.K. that the prosecutor indicated were influential, there were also significant differences between the two. Most importantly, Juror No. 18 expressed strong positive experiences with law enforcement and appeared sympathetic to the prosecution. In short, the limited similarity in their questionnaire and voir dire responses does not suggest pretext.

Because the prosecutor's race-neutral reasons were supported and plausible, the trial court was not required to further question the prosecutor or make detailed findings. (*People v. Reynoso, supra,* 31 Cal.4th at p. 926; *People v. Allen, supra,* 115 Cal.App.4th at pp. 547–548.) Under these circumstances, the trial court did not err in denying Fuller's *Batson/Wheeler* motion with respect to M.K.

*Fuller,* 2017 WL 1131822 at *6–*13.

## B.    Legal Standard

The use of peremptory challenges by either the prosecution or defense to exclude cognizable groups from a jury may violate the Equal Protection Clause. *See Georgia v. McCollum*, 505 U.S. 42, 55–56 (1992). The Supreme Court has held that the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986).[3] *Batson* permits prompt rulings on objections to peremptory challenges under a three-step process:

First, the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93–94.

---

[3] The California counterpart to *Batson* is *People v. Wheeler*, 22 Cal.3d 258 (1978).

Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000).

Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195. To fulfill its duty, "the trial court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its own observations and the assistance of counsel." *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004); *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003). "As part of its evaluation of the prosecutor's reasoning, the court must conduct a comparative juror analysis—that is, it must 'compare African American panelists who were struck with those non-African American panelists who were allowed to serve.'" *Jamerson v. Runnels*, 713 F.3d 1218, 1224 (9th Cir. 2013) (quoting *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)). "The prosecution's treatment of minority jurors as compared to its treatment of nonminority jurors is among the facts indicative of the presence of a purpose to discriminate." *McDaniels v. Kirkland*, 813 F.3d 770, 778 (9th Cir. 2015) (en banc) (citing *Miller-El v. Dretke ("Miller-El II")*, 545 U.S. 231, 241 (2005)).

In evaluating the race neutrality explanation, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *See Hernandez v. New York*, 500 U.S. 352, 355–62 (1991) (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony). It should also keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility. *See Rice v. Collins*, 546 U.S. 333, 340–41 (2006); *Lewis*, 321 F.3d at 830. Because determinations of credibility and demeanor of the prosecutor and jurors lie "'peculiarly within [the] trial judge's province,'" the trial court's ruling on the issue of discriminatory intent is entitled to great deference and must be sustained unless clearly erroneous. *Snyder v. Louisiana*, 552 U.S. 472, 476–82 (2008) (quoting *Wainwright v.*

*Witt*, 469 U.S. 412, 428 (1985)); *see Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (per curiam) (reversing Ninth Circuit's "inexplicable" and "unexplained" finding that proffered race-neutral explanations for peremptory strikes were insufficient to outweigh evidence of purposeful discrimination).

The Ninth Circuit has emphasized that a federal court on habeas review must afford deference to a state court's decision on a *Batson* claim.

> A state court's finding that the prosecutor did not engage in purposeful discrimination is reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d)(2). *See Briggs*, 682 F.3d at 1170; *Cook v. LaMarque*, 593 F.3d 810, 816 (9th Cir. 2010); *Ali v. Hickman*, 584 F.3d 1174, 1180–81 (9th Cir. 2009). Thus, the state court's decision will be upheld unless it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Indeed, in evaluating habeas petitions premised on a *Batson* violation, "our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it." *Briggs*, 682 F.3d at 1170 (citing *Rice*, 546 U.S. at 338–42, 126 S.Ct. 969). This is because the question of discriminatory intent "largely will turn on evaluation of credibility" and "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859 (internal quotation marks and citations omitted).

*Jamerson*, 713 F.3d at 1224–25.

### C.    Analysis

The parties focus solely on the third step of the *Batson* analysis. Petitioner argues that the trial court completely failed to conduct the third step of the *Batson* analysis and that he is therefore entitled to a new trial with jurors not pre-qualified based on their race. Dkt. No. 1-2 at 2–31. Respondent argues that the state court's determination that the prosecutor's race-neutral reasons were genuine was not unreasonable. Dkt. No. 10-1 at 7, 26–28. Although respondent further argues that the state court's factual findings should be entitled to a presumption of correctness under § 2254(e)(1), respondent concedes that under Ninth Circuit authority, the state court's conclusion that there was no purposeful discrimination is subject to federal habeas review under § 2254(d)(2) for "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Briggs*, 682 F.3d at 1170 and n.4.

1    In evaluating petitioner's *Batson* claim, the Court reviews the California Court of

2    Appeal's opinion on direct appeal as the last reasoned decision of the state court. *Ali v.*

3    *Hickman*, 584 F.3d 1174, 1181 n.5 (9th Cir. 2009). The state appellate court's findings

4    on the issue of discriminatory intent are findings of fact entitled to AEDPA deference

5    under § 2254(d)(2). *Briggs*, 682 F.3d at 1170 and n.4; *Ali*, 584 F.3d at 1180–81.

6    Petitioner contends that the state court unreasonably applied clearly established

7    federal law because the trial court's finding that the prosecutor's race-neutral reasons

8    were "plausible" fell short of a finding that there was no purposeful discrimination under

9    *Batson.* Petitioner cites no Supreme Court authority requiring the trial court make an

10   express finding that the defendant has not carried his burden of proving purposeful

11   discrimination where the trial court has found that the prosecutor has provided "plausible

12   race-neutral reasons" in light of the record. *See Collins*, 546 U.S. at 341. Following the

13   Supreme Court's holding in *Miller-El II*, the state appellate court considered the support in

14   the record for each of the prosecutor's reasons for challenging M.K. and M.F. and

15   determined that the trial court properly assessed "the *plausibility* of that reason in light of

16   all evidence with a bearing on it." *Fuller,* 2017 WL 1131822 at *11 (quoting *Miller-El II*,

17   545 U.S. at 251–52).

18   Petitioner is correct that the trial court did not make an express finding on the

19   record whether petitioner carried his burden of proving purposeful discrimination and did

20   not perform a comparative analysis. However, after reviewing the record, the state

21   appellate court concluded that it could reasonably infer that the trial court found no race

22   discrimination because "the trial court asked probing questions, [the trial court] showed its

23   familiarity with the voir dire record, and the prosecutor's stated race-neutral reasons for

24   exercising peremptory challenges against both M.F. and M.K. were plausible and

25   supported by the record." *Fuller*, 2017 WL 1131822 at *12. The state court also

26   conducted a comparative juror analysis as to M.K. and considered that at the time the

27   prosecutor challenged both M.F. and M.K., Juror No. 16, an African-American juror who

28   was ultimately seated, remained on the panel, as another factor indicating good faith. *Id.*

United States District Court
Northern District of California

*See Gonzalez v. Brown*, 585 F.3d 1202, 1210 (9th Cir. 2009) ("The fact that African-American jurors remained on the panel may be considered indicative of a nondiscriminatory motive.") (citation and internal marks omitted). Accordingly, the state appellate court reasonably applied clearly established Supreme Court authority which, as the Ninth Circuit has recognized, requires the trial court to assess the plausibility of a prosecutor's reasons in light of the evidence. "[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Gonzalez*, 585 F.3d at 1207 (quoting *Miller-El II*, 545 U.S. at 251–52). The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law under § 2254(d)(1).

Nor was the state court's denial of this claim based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Under Ninth Circuit authority, habeas relief on a *Batson* claim is warranted if the state court failed to consider evidence in the record "that undeniably contradicted the prosecutor's purported motivations," and the state court "unreasonably accepted his nonracial motives as genuine." *Kesser v. Cambra*, 465 F.3d 351, 358 (9th Cir. 2006) (en banc). On habeas review, the court considers "whether a prosecutor's justifications are contrary to the evidence in the record, such as being 'implausible or fantastic,' based on mischaracterizations of a prospective juror's testimony, or belied by a comparative juror analysis." *Sifuentes v. Brazelton*, 825 F.3d 506, 518 (9th Cir. 2016) (as amended) (citations omitted). "Conversely, we consider whether evidence in the record shows that at least some of the prosecutor's reasons were 'permissible and plausible.'" *Id.* (citing *Collins*, 546 U.S. at 341). Here, the state appellate court directly addressed the third *Batson* step, conducted a comparative juror analysis as to M.K., and considered other evidence in the trial record in determining that the race-neutral justifications for removing jurors M.F. and M.K. were plausible and supported by the record.

In *McClain v. Prunty*, 217 F.3d 1209, 1221–23 (9th Cir. 2000), the Ninth Circuit found that the state court's denial of the *Batson* claim was based on an unreasonable

determination of the facts where the proffered reasons for challenging black jurors, SR and JH, were contradicted by the record or proven pretextual by a comparative analysis. The prosecutor stated that he struck juror SR because she mistrusted the system and believed that she had been treated unfairly; because she lied about being a stewardess; and because she did not have decision-making experience. The Ninth Circuit found that the first two reasons were contradicted by the record, in that SR never said that she was treated unfairly or that she did not trust the system that she had stated unequivocally that she could be fair; and SR never stated that she was a stewardess and only stated that she worked in airline maintenance. As to the third reason given by the prosecutor, that SR lacked decision-making experience, the Ninth Circuit conducted a comparative analysis which revealed that this reason was pretextual because prospective Juror MG, a non-black juror, was impaneled even though he had never served on a jury and had no significant group decision-making experience.

With respect to the second juror at issue in *McClain,* the prosecutor stated that he struck juror JH because she volunteered as a counselor for a drug program and would therefore root for the underdog; did not speak in ordinary language and gave highly intellectual answers; and was overly intellectual and therefore would not get along with other jurors. These reasons were also contradicted by the record. JH was a research drug information pharmacist at the VA, not a drug program counselor; her voir dire answers were not highly intellectual; and she had previously served on a jury that had reached a verdict indicating she could get along with other jurors. *McClain*, 217 F.3d at 1220–24. Based on the record and the comparative analysis, the Ninth Circuit found that the state court's finding that the prosecutor did not purposefully discriminate in exercising peremptory challenges against Jurors SR and JH, was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.* at 1224.

In *Castellanos v. Small*, 766 F.3d 1137 (9th Cir. 2014), the prosecutor struck Venirewoman 4968, a Hispanic female, on the race-neutral grounds that she didn't have

24

children. The record contradicted this reason, in light of evidence that Venirewoman 4968 had two adult children. Noting that the state court did not engage in a comparative juror analysis, *id.* at 1145, the Ninth Circuit conducted a comparative analysis in the first instance on federal habeas review, limited to the evidence presented in the state court proceeding, which suggested that the race-neutral justification for removing Venirewoman 4968 was pretextual: the prosecutor ultimately sat three venirepersons who had no children, and also sat a fourth venireperson who did not answer the question regarding whether he had children. *Castellanos*, 766 F.3d at 1148–49. The Ninth Circuit concluded that the state court's finding was an unreasonable determination of the facts in light of the evidence presented where the comparative juror analysis revealed "such significant evidence of pretext." *Id.* at 1150.

Here, unlike *McClain* and *Castellanos* where the trial court records contradicted the prosecutors' proffered reasons for striking jurors, the state court reviewed the record before the trial court and found that the evidence supported the prosecutor's race-neutral reasons for challenging jurors M.F. and M.K. *See Kesser*, 465 F.3d at 371 ("Under *Batson*'s third step, state courts must review the record to root out" pretextual reasons). The court of appeal noted that the prosecutor challenged M.F. because M.F. mentioned numerous times on his questionnaire that he had problems with police and stated that, in the past, he believed police officers made race-based decisions; and the prosecutor was concerned that M.F. still harbored these negative feelings towards the police, even though the relevant incidents took place in the 1960s. Petitioner does not dispute that the prosecutor correctly reported M.F.'s responses to the questionnaire. Rather, Petitioner argues that this reason was pretextual because M.F.'s negative experiences with police officers took place more than 50 years prior to trial, and that characterizing this reason as race-neutral would allow the removal of nearly all African American males and most African American woman.

Petitioner's argument is based on a limited view of the record. The prosecutor challenged M.F. not solely because of his negative experiences with police officers, but

because M.F.'s questionnaire responses caused the prosecutor to doubt M.F.'s statements that he could be fair and impartial, and would not be biased against police officers. Specifically, in response to the question asking whether he had negative or positive experience with law enforcement, he simply wrote "Yes," and then when asked to explain, wrote, "I'm Black!" In response to the question asking whether police officers tell the truth, he stated that he did not know many officers and then wrote, "Crooked cops," which is reasonably interpreted as his current assessment of police officers' veracity. In response to the question asking his opinion as to how many women are telling the truth when they report being raped, he circled "most of them" and then followed up with, "Tell Boston cops a Black guy did it," which was not directly responsive to the question. *Fuller,* 2017 WL 1131822 at *7; CT Supp. 304, 307.

The court of appeal found that M.F.'s questionnaire and oral voir dire responses "clearly expressed his negative views of law enforcement," which supported the prosecutor's legitimate race-neutral reason to challenge M.F. *Fuller,* 2017 WL 1131822 at *12. Noting that the trial court did not make an express finding that the prosecutor's proffered explanation was genuine, the court of appeal held that the prosecutor's stated reasons for challenging M.F. were both inherently plausible and supported by the record, and found that the trial court asked probing questions and showed its familiarity with the voir dire record, to infer that the trial court had implicitly determined the prosecutor's race-neutral explanations to be genuine. *Id.* at *11–*12.

As to juror M.K., the court of appeal noted that the prosecutor challenged M.K. because of her former profession as a preschool director; her liberal tendencies which he inferred from her charitable donations; her views on the death penalty and prostitution; her statements denying that her husband was a republican and that her husband had left a job at a district attorney's office for a "more proactive" role at Legal Aid; and her son's substance abuse problems, as reflected in M.K.'s questionnaire and voir dire responses. Petitioner argues that the prosecutor's reasoning was pretextual because a seated Caucasian juror, Juror No. 18, was also a teacher. *See* Dkt. No. 1-2 at 29. However, the

court of appeal conducted a comparative analysis and determined that, unlike M.K., "Juror No. 18 expressed strong positive experiences with law enforcement and appeared sympathetic to the prosecution." *Fuller*, 2017 WL 1131822 at *13. These findings of the state court are reasonable in light of the record, which reflects that M.K. answered that she thought police officers tell the truth the same as most people because "people are people, even police officers," and reported having both positive and negative experiences with police officers, CT Supp. 971, 974, whereas Juror No. 18 stated that she thought police officers told the truth more often than most people, and reported having only had a positive experience with police officers, CT 364, 367. Juror No. 18 also reported no contributions to any criminal justice advocacy organizations, and stated that she believed prostitution should be illegal. Accordingly, the state court found that the limited similarity in M.K. and Juror No. 18's responses did not suggest pretext; that the prosecutor's stated race-neutral reasons for exercising a peremptory challenge against M.K. were plausible and supported by the record; and that the trial court asked probing questions and showed its familiarity with the voir dire record in denying the *Batson/Wheeler* motion on the ground that "*the People have articulated a plausible, rational and non-discriminatory justification* for her excusal," *Fuller*, 2017 WL 1131822 at *10, *13. Although a state appellate court is not "in an ideal position to conduct a step three evaluation," it can "use the trial court's findings and the evidence on the record to evaluate the support on the record for the prosecutor's reasons and credibility, and to compare the struck and empaneled jurors," as the court of appeal did here. *Lewis*, 321 F.3d at 832.

Having considered "the totality of the relevant facts," *Kesser*, 465 F.3d at 359 (citations and internal marks omitted), the court finds that the state court's denial of petitioner's *Batson* claim, based on the prosecutor's peremptory challenges of jurors M.F. and M.K., was not based on an unreasonable determination of the facts. *See Collins*, 546 U.S. at 340–41 (finding of discriminatory intent turns largely on trial court's evaluation of prosecutor's credibility). Habeas relief is denied on this claim.

**II.    Insufficiency of the Evidence Claim**

Petitioner alleges that there was insufficient evidence to support the conviction for aggravated kidnapping because there was both insufficient evidence of "substantial movement" and insufficient evidence that the movement "substantially increased the risk of harm" to the victim.  Dkt. No. 1-2 at 36.  *See Fuller*, 2017 WL 1131822 at *14 (the asportation element of aggravated kidnapping under Cal. Penal Code § 209(b) requires movement of the victim that (1) is more than merely incidental to the underlying crime, and (2) increases the risk of harm to the victim beyond that inherent in the underlying crime).

**A.    State Court Denial of Insufficiency of the Evidence Claim**

The California Court of Appeal denied the insufficiency of the evidence claim as follows:

B. *Substantial Evidence to Support Aggravated Kidnapping Conviction*

Fuller challenges the evidence underlying the asportation element of his aggravated kidnapping conviction. Specifically, he maintains no substantial evidence supports the jury's implicit findings that the movement of Doe 1 was not merely incidental to rape, and the movement increased the risk of harm to Doe 1 above that necessarily present in any rape, as required under Penal Code section 209, subdivision (b). He contends Doe 1 was moved "an insignificant distance within a public parking lot ... into a more illuminated location." Fuller's characterization of the evidence is unpersuasive.

When faced with a substantial evidence challenge, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) "A reviewing court must accept logical inferences the [fact finder] might have drawn from the circumstantial evidence. [Citation.] ' "A reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] ... A finding of fact must be an inference drawn from evidence rather than ... a mere speculation as to probabilities without evidence.' " ' " (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1416–1417.)

Nor is *substantial* evidence synonymous with *any* evidence. (*People v. Superior Court (Jones*) (1998) 18 Cal.4th 667, 681, fn. 3.) However, "the direct testimony of a single witness is sufficient to support a finding unless the testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions.' [Citations.] Except in these rare instances of demonstrable falsity, doubts about the credibility of the in-court witness

should be left for the [fact finder]'s resolution." (*People v. Cudjo* (1993) 6 Cal.4th 585, 608–609.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Penal Code section 209, subdivision (b), provides, in relevant part: "(1) Any person who kidnaps or carries away any individual to commit ... rape ... shall be punished by imprisonment in the state prison for life with the possibility of parole. [¶] (2) This subdivision shall only apply if the movement of the victim is *beyond that merely incidental* to the commission of, and *increases* the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (Italics added.) Thus, the asportation element of aggravated kidnapping requires movement of the victim that (1) is more than merely incidental to the underlying crime, and (2) increases the risk of physical or psychological harm to the victim beyond that inherent in the underlying crime. (*Id.*, § 209, subd. (b)(2); *People v. Nguyen* (2000) 22 Cal.4th 872, 885–886; *People v. Martinez* (1999) 20 Cal.4th 225, 232–233; *People v. Shadden* (2001) 93 Cal.App.4th 164, 168.) "These two aspects are not mutually exclusive, but interrelated." (*People v. Rayford* (1994) 9 Cal.4th 1, 12, disapproved on other grounds by *People v. Acosta* (2002) 29 Cal.4th 105, 120, fn. 7.)

Many courts have grappled with the asportation element of aggravated kidnapping and attempted to define incidental movement of the victim, with conflicting results. (Compare *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1048–1050 & *People v. Shadden, supra,* 93 Cal.App.4th at p. 169 ["[w]here a defendant drags a victim to another place, and then attempts a rape, the jury may reasonably infer the movement was neither part of nor necessary to the rape"] with *People v. Hoard* (2002) 103 Cal.App.4th 599, 606–607 ["incidental and necessary do not mean the same thing"].) "The first prong of the asportation standard, whether the movement is merely incidental to the crime of rape, depends on the scope and nature of the movement. [Citation.] Although actual distance is a factor for consideration, it is not conclusive. [Citations.] Instead, the approach must focus on the 'context of the environment in which the movement occurred.' " (*People v. Salazar* (1995) 33 Cal.App.4th 341, 346–347; accord, *People v. Dominguez* (2006) 39 Cal.4th 1141, 1151–1152 (*Dominguez*).) If the movement changes the victim's environment, it does not have to be a great distance to be substantial. (*Shadden*, at p. 169; see, e.g., *People v. Smith* (1995) 33 Cal.App.4th 1586, 1593–1594.)

Our Supreme Court, in *Dominguez, supra*, 39 Cal.4th 1141, clarified the controlling principles. The court observed: "The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement. [Citation.] We have articulated various circumstances the jury should consider, such as whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes. ... [¶] Measured distance ... is a relevant factor, but one that must be considered in context, including the nature of the crime and its environment. In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient. For example, moving robbery victims between six and 30 feet within their home or apartment [citation] or 15 feet from the teller area of a bank to its vault (*People v. Washington* (2005) 127 Cal.App.4th 290, 299)

may be viewed as merely incidental to the commission of the robbery and thus insufficient to satisfy the asportation requirement of aggravated kidnapping. Yet, dragging a store clerk nine feet from the front counter of a store to a small back room for the purpose of raping her (see *People v. Shadden*[, *supra*,] 93 Cal.App.4th [at p.] 167) or forcibly moving a robbery victim 40 feet within a parking lot into a car (see *People v. Jones* (1999) 75 Cal.App.4th 616, 629) might, under the circumstances, substantially increase the risk of harm to the victim and thus satisfy the asportation requirement. These examples are illustrative only; each case must be considered in the context of the totality of its circumstances. [¶] Robberies and sex crimes, the necessary predicates for an aggravated kidnapping (see [Pen. Code,] § 209), can of course be committed in a variety of ways. To catalog all the myriad and various possible aspects of such crimes would be impossible. But ... the applicable test *under* [*Penal Code*] *former section 208*(*d*) is clear: for aggravated kidnapping, the victim must be forced to move a substantial distance, the movement cannot be merely incidental to the target crime, and the movement must substantially increase the risk of harm to the victim. Application of these factors in any given case will necessarily depend on the particular facts and context of the case." (*Dominguez,* at pp. 1152–1153, italics added & omitted.)

In *Dominguez*, the defendant moved the victim, at night, 25 feet from a public road to an orchard, 10 to 12 feet below the road level, which "tended to obscure [the] defendant's crime from any onlookers." (*Dominguez, supra*, 39 Cal.4th at pp. 1153–1154.) The court reasoned: "The movement thus changed the victim's environment from a relatively open area alongside the road to a place significantly more secluded, substantially decreasing the possibility of detection, escape or rescue. This case is thus unlike the brief and trivial movements of the robbery victims around a room, as in [*People v. Daniels* (1969) ] 71 Cal.2d 1119, ... movements found to be merely incidental to commission of the offense. [The] defendant's movement of the victim down an embankment and into an orchard cannot be said to have been merely incidental to the rape. [¶] ... [¶] ... [A] forced movement need not be into an 'enclosure' to effect a substantial increase in the risk of harm. Moreover, a reasonable jury could have concluded that the place to which the victim was moved was in fact one obscured from public view. Although the Court of Appeal reasoned that there was 'a clear line of sight to the top of the embankment ... suggesting that anyone standing by the road would have had a clear view of the spot' where the rape occurred, a reasonable jury could have concluded, based on all the evidence, including the time of night and the isolated environment, that any passerby would likely be in a car, not on foot, and would not likely stop to look down the embankment into the orchard." (*Dominguez,* at pp. 1153–1154.)

Here too, the jury could have reasonably found Fuller's movement of Doe 1 was more than merely incidental to the intended rape. A rape could have been committed by the black pickup truck, next to the drive-thru lane and Nevin Avenue, where Fuller first began to attack Doe 1. Instead Fuller moved her 66 feet to a spot near the restaurant's rear wall and garbage can. Fuller did not move Doe 1 a great distance, but the jury could have reasonably found the movement significantly changed Doe 1's environment. In the first location, Doe 1 was upright, in a place where she would likely have been visible to cars passing along Nevin Avenue or the drive-thru lane. In the second location, she was on her back, on the ground, in a place where she was, according to Harris, less visible to passing motorists and could not escape as easily— because the garbage can, restaurant wall, and Fuller's physical presence

impeded her free movement. Substantial evidence supports the jury's implicit finding that Fuller's movement of Doe 1 was not merely incidental to the underlying crime of rape. [FN 18]

> FN 18: Fuller's reliance on cases involving movements of short distances for the purpose of robbery does not compel a contrary conclusion. (See, e.g., *People v. Williams* (2017) 7 Cal.App.5th 644, 670 [movement was merely incidental to robbery because victims were moved to back of store "to achieve [the defendants'] objective of emptying the cages and safes of merchandise without detection by customers or other people outside the store"].) "Kidnapping for the purpose of robbery is not analogous to kidnapping for the purpose of rape. ... [R]ape victims are more vulnerable to attack and at greater risk when they are concealed from public view." (*People v. Robertson* (2012) 208 Cal.App.4th 965, 986; accord, *Williams*, at p. 669.)

Substantial evidence also supports the jury's implicit finding the movement resulted in an increase in the risk of harm to Doe 1. "Any determination of the increase in the risk of harm involves a comparison of the victim's physical location before and after the asportation." (*People v. Salazar, supra,* 33 Cal.App.4th at p. 348.) "The second prong ... includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not, in fact, materialize does not, of course, mean that the risk of harm was not increased." (*People v. Rayford, supra,* 9 Cal.4th at pp. 13–14.) The increased risk of harm to the victim may be physical, emotional, or psychological. (*People v. Power* (2008) 159 Cal.App.4th 126, 138; accord*, People v. Nguyen, supra,* 22 Cal.4th at pp. 885–886.)

Fuller maintains his conviction for kidnapping with intent to commit rape must be reversed because the risk of harm to Doe 1 was not "*substantially* increased." (Italics added.) This test was first articulated in *People v. Daniels, supra,* 71 Cal.2d 1119, which provided the movement must "substantially" increase the risk of harm. However, in 1997, the Legislature amended Penal Code section 209, subdivision (b)(2), and omitted the word "substantially" from the phrase. (*People v. Vines, supra,* 51 Cal.4th at p. 869, fn. 20.) Fuller does not explicitly raise any dispute regarding the meaning of the amendment in his opening brief, nor does he challenge the instruction the jury received in this case. [FN 19] It is only in his reply brief that Fuller explicitly argues the Legislature did not intend to modify the *Daniels* "*substantially*" increase the risk of harm" standard. (Italics added.) Even then, he does not adequately cite the purportedly relevant legislative history or adequately analyze the question of statutory interpretation. Thus, he has forfeited the argument. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363–364; *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4.)

> FN 19: In relevant part, the jury was instructed, without objection: "As used here, substantial distance means more than a slight or trivial distance. The movement must have *increased* the risk of physical or psychological harm to the person beyond that necessarily present in the crime of rape." (Italics omitted & added.)

In any event, our Supreme Court has recognized repeatedly, albeit in dicta, that the 1997 amendment, "modified the asportation standard by eliminating the requirement that the movement of the victim 'substantially' increase the

risk of harm to the victim." (*People v. Vines, supra,* 51 Cal.4th at p. 870, fn. 20*; People v. Martinez, supra*, 20 Cal.4th at p. 232, fn. 4 [aggravated kidnapping statute "does not require that the movement 'substantially' increase the risk of harm to the victim"].) We are not persuaded by Fuller's reliance on *Dominguez, supra*, 39 Cal.4th 1141. In *Dominguez*, the defendant's offense predated the 1997 amendment of Penal Code section 209, subdivision (b), and our Supreme Court "express[ed] no view" on the asportation requirement under that section. (*Id.* at p. 1150, fn. 5.) [FN 20] Other courts have reached the issue and concluded, as we do here, that the standard applicable to crimes that postdate the amendment is "increase the risk of harm." (See *People v. Robertson, supra,* 208 Cal.App.4th at p. 978 ["[Penal Code] section 209, subdivision (b)(2) does *not* require the People to prove that the movement *substantially* increased the risk of harm"].) We turn now to the question of whether the evidence was sufficient to satisfy the current test.

> FN 20: We are also unpersuaded by Fuller's citation of *People v. Curry* (2007) 158 Cal.App.4th 766, in which the Third District Court of Appeal stated, without discussion, the prosecution was required to prove that movement of the victim "substantially increased the risk of harm to the victim." (*Id.* at p. 780.) There was no discussion of the governing language of section 209, subdivision (b)(2) or any apparent argument on the issue. (*Ibid.*) Opinions are not authority for propositions not considered. (*People v. Avila, supra,* 38 Cal.4th at p. 566.)

Fuller insists that, as a matter of law, he could not have increased the risk of harm to Doe 1 by moving her from one dark, unconcealed place within the parking lot to another unconcealed location with better lighting. Fuller points out that the photographs of the scene show that, in the predawn hours when the crime occurred, the area by the black truck appears darker than the area to which Doe 1 was dragged. He asks us to ignore Harris's testimony that it was actually darker in the second location, implicitly claiming such testimony is inherently improbable or demonstrably false. [FN 21] He also suggests the parked cars on Nevin Avenue means any attack by the pickup truck would have been just as obscured from drivers on the street as it was in the second location.

> FN 21: Harris testified: "When I first saw them, they were actually only illuminated by the filtering lights and by the ambient light in the area, parking lot lights next to the drive-thru. And I could see two forms on the ground when I first entered the lot. It wasn't until my headlights had illuminated them clearly that I was able to make a determination as to what may be going on."

"The inherently improbable standard addresses the basic content of the testimony itself—i.e., could that have happened?—rather than the apparent credibility of the person testifying. Hence, the requirement that the improbability must be 'inherent,' and the falsity apparent 'without resorting to inferences or deductions.' [Citation.] In other words, the challenged evidence must be improbable ' "on its face" ' [citation], and thus we do not compare it to other evidence (except, perhaps, to certain universally accepted and judicially noticeable facts). The only question is: Does it seem *possible* that what the witness claimed to have happened actually happened?" (*People v. Ennis* (2010) 190 Cal.App.4th 721, 729.)

Fuller has presented no reason that Harris's statements regarding location

and lighting cannot possibly be true. The mere existence of contradictory testimony is insufficient. (See *People v. Thompson* (2010) 49 Cal.4th 79, 124–125 [rejecting claim witness's testimony inherently incredible because contradicted by physical evidence]; *DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 260–261 [rejecting similar claim where witness's testimony undermined by his own later testimony and contradicted by documentary evidence]; *People v. Ennis, supra*, 190 Cal.App.4th at pp. 728–730.) Fuller's attempt to reargue the evidence on appeal is unpersuasive. " '[I]t is not a proper appellate function to reassess the credibility of the witnesses.' " (*Thompson*, at p. 125.)

In any event, even if we put aside Harris's testimony regarding the relative darkness of the various areas outside the McDonald's, there is substantial evidence of an increased risk of harm. Here, Harris testified that a slightly elevated grassy area at the northernmost portion of the McDonald's parking lot also blocked his view of Doe 1 and Fuller from the street. "The driveway for the drive-thru is fairly flat, but elevated slightly above the sidewalk. The parking lot itself actually has a slight decline .... So, we are not talking about a huge incline, but there is enough that with the trees and vehicles, *I didn't have a clear view* [of Doe 1 and Fuller] *until I actually entered the lot.*" (Italics added.) A reasonable jury could infer Harris would have had a better view of the attack if it had continued by the truck. Thus, the evidence shows Fuller grabbed Doe 1 at the edge of a restaurant parking lot, adjacent to the road and the drive-thru lane, dragged her approximately 66 feet, and placed her, on her back, in an area closer to the restaurant, but less visible from the road. Harris specifically testified that Doe 1's movement was also restricted at the second location by the restaurant's wall and the garbage can. The jury could have reasonably found the change of environment made an escape by Doe 1 more difficult and, therefore, more dangerous. Perhaps that is why, at least according to Doe 1's testimony at trial, Fuller did not begin kicking her and removing her pantyhose until she had been moved.

Fuller further points out that, by moving Doe 1 from the area by the truck closer to the restaurant, he brought her closer to the employees of the restaurant. In fact, on cross-examination, Doe 1 testified that two McDonald's employees were in the parking lot at the time, as well as two male customers "waiting for the door to open." However, given Harris's testimony, there are reasonable inferences other than the inference Fuller asks us to draw—that any movement, if it occurred, took Doe 1 closer to potential sources of aid. It is worth repeating that this attack took place in the early hours of the morning. Although the record is not entirely clear as to whether the dine-in portion of the McDonald's had opened at the time of the attack, the jury could have reasonably found the change of environment obscured Fuller's actions to drivers, which decreased the likelihood Fuller's crimes would be detected and enhanced his opportunity to commit additional crimes. The fact McDonald's employees alerted Harris to the struggle between Fuller and Doe 1 is not dispositive. The danger does not need to materialize for the risk of harm to increase. (*People v. Rayford, supra*, 9 Cal.4th at p. 14.)

*People v. Stanworth* (1974) 11 Cal.3d 588 is distinguishable. In that case, the Supreme Court reversed an aggravated kidnapping conviction based on the defendant's having dragged the victim to an open field, in the early evening, 25 feet away from the road. (*Id.* at p. 597.) Thus, there was "no evidence that the relatively brief movement of the victim ... removed her from public view or in any other manner *substantially* increased the risk, beyond that inherent in the underlying crimes, that she would suffer physical harm." (*Id.* at p. 598,

italics added.) As we have discussed, after the decision in *Stanworth*, the Legislature amended the aggravated kidnapping statute to require only that the movement of the victim "increase," rather than "substantially increase," the victim's risk of harm. (See Pen. Code, § 209, subd. (b)(2); *Dominguez, supra*, 39 Cal.4th at p. 1150, fn. 5.) Furthermore, unlike in *Stanworth*, because the movement of Doe 1 took place in the early hours of the morning and took her further from the public street, the evidence is sufficient to support a jury finding Fuller's movement of Doe 1 rendered her less visible to anyone who might have driven by and summoned aid. The evidence is sufficient to support Fuller's conviction for aggravated kidnapping.

*Fuller*, 2017 WL 1131822 at *14–*18.

## B. Legal Standard

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *id.* at 324. On federal habeas review, the *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16.

Supreme Court authority makes clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. *Coleman v. Johnson (Lorenzo)*, 566 U.S. 650, 651 (2012) (per curiam). First, on direct appeal, an appellate court "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Id.* (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). Second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (internal citations omitted).

On habeas review of a claim challenging sufficiency of the evidence, the federal court determines only whether, "'after viewing the evidence in the light most favorable to

34

the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Smith*, 565 U.S. at 7 (quoting *Jackson,* 443 U.S. at 319). If confronted by a record that supports conflicting inferences, the reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* (quoting *Jackson*, 443 U.S. at 326). That is, only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *Jackson*, 443 U.S. at 324.

### C. Analysis

Petitioner argues that there was insufficient evidence to support his conviction for aggravated kidnapping because the victim was only moved a couple car lengths along a flat area within the parking lot; the victim was moved to a better-lit part of the lot adjacent to the restaurant, its drive-through line, and the restaurant's employees; the victim was moved to an area which was not obstructed from view unlike the area where the victim initially encountered petitioner; the victim was no more less able to escape in the new location; and the victim was not moved into a car or building. Dkt. No. 1-2 at 48. Petitioner's arguments fail to acknowledge that conflicting evidence was presented at trial and that the jury resolved the evidentiary question in favor of the prosecution. To the extent that petitioner argues that state law requires that the risk of harm must be "substantially" increased, his argument contradicts the state court's interpretation of Cal. Penal Code § 209 and lies beyond the scope of a cognizable *Jackson* claim. Dkt. No. 1-2 at 37–50. *See Fuller*, 2017 WL 1131822 at *16 (citing California Supreme Court recognizing that the asportation standard was modified by statutory amendment to eliminate the requirement that the movement of the victim 'substantially' increase the risk of harm to the victim").

Petitioner argues that the distance Doe 1 was moved did not increase the risk of harm to her because she was only moved a couple car lengths to a better-lit area that was closer to the restaurant and its employees, and claims that the evidence was

35

1    insufficient to support his conviction.  Petitioner's argument would require the court to

2    reject the jury's credibility determination as to Officer Harris' testimony, rather than

3    deferring to the jury's role as factfinder as required on federal habeas review.  *Johnson*

4    *(Lorenzo)*, 566 U.S. at 651, 655.  The court may not substitute its judgment for that of the

5    jury.  *See Smith*, 565 U.S. at 2; *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam)

6    ("'it is the responsibility of the jury—not the court—to decide what conclusions should be

7    drawn from evidence admitted at trial'") (quoting *Smith,* 565 U.S. at 2)).

8          Here, the evidence at trial presented a conflict among different possible

9    inferences, which the jury resolved in favor of the prosecution.  Petitioner presented

10    evidence that the area where Doe 1 ended up was better lit, was closer to employees,

11    and was neither easier nor harder to escape from.  In contrast, Officer Harris testified that

12    petitioner dragged Doe 1 approximately 66 feet to a darkened alcove between a

13    recessed portion of the restaurant's rear wall and a garbage can, and this alcove area

14    was difficult to see from the street because the parking lot slightly sloped downwards

15    from the street to the alcove area.  RT 398, 406–08, 420.  A jury could reasonably infer

16    from this testimony that Doe 1 was less visible after she was moved, and that her

17    movement was more restricted after she was moved because she was between a wall

18    and a garbage can.  Applying the twice-deferential standard of review for state court

19    rejections of sufficiency of the evidence claims, the court concludes that, viewing the

20    evidence presented at trial in the light most favorable to the prosecution, there was

21    sufficient evidence for any rational trier of fact to find proof of guilt beyond a reasonable

22    doubt.  Accordingly, the state court's rejection of petitioner's sufficiency of the evidence

23    claim was not objectively unreasonable and this claim is denied.

24    **III.**    **Instructional Error Claims**

25          Petitioner alleges that the trial court erred by (1) failing to instruct the jury that a

26    defendant's reasonable but mistaken belief in consent to rape could be a defense to the

27    uncharged prior bad act and by (2) failing to instruct the jury regarding petitioner's out of

28    court statement to police.

**A.    Legal Standard**

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding.  *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).  To be cognizable on federal habeas review, the claimed error in omitting an instruction "must so infect[ ] the entire trial that the resulting conviction violated due process."  *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).  "Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury."  *Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995).  Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982).  A habeas petitioner whose claim involves the failure of a state court to give a particular instruction, as opposed to a claim that the court gave an incorrect instruction, bears an "especially heavy burden." *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155); *see also Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (as amended).

**B.    Failure to Give Instruction Regarding Reasonable but Mistaken Belief in Consent to Rape as Defense to Uncharged Prior Bad Act**

**1.    State Court Denial of Claim**

The California Court of Appeal denied this instructional error claim as follows:

D. Mayberry *Instruction*

Assuming the section 1108 evidence was properly admitted, Fuller alternatively contends the trial court erred by failing to instruct the jury that a defendant's reasonable though mistaken belief in consent is a defense to the 2003 rape or sexual battery. (*People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*); *People v. Andrews* (2015) 234 Cal.App.4th 590, 602.) We disagree.

Fuller concedes he did not rely on a mistake of fact defense at trial; he relied on actual consent. Thus, defense counsel did not request a *Mayberry* instruction and no such instruction was given. However, "[i]n criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. [Citation.] 'A trial court's duty to instruct, sua sponte, on particular defenses arises " 'only if [1] it appears that the defendant is relying on such a defense, or [2] if there is substantial evidence supportive of such a defense and the defense is not inconsistent

37

with the defendant's theory of the case.' " ' " (*People v. Martinez* (2010) 47 Cal.4th 911, 953.); accord, *Dominguez, supra,* 39 Cal.4th at p. 1148; *People v. Andrews, supra,* 234 Cal.App.4th at p. 601.) We consider if this second prong was met.

"The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*People v. Williams* (1992) 4 Cal.4th 354, 360–361, fn. omitted (*Williams*).) "It is only in the case where there is substantial evidence supporting both components of the defense that the court must give a *Mayberry* instruction." (*People v. Andrews, supra,* 234 Cal.App.4th at p. 603.) If the prosecution's case does not itself raise such a doubt, "[t]he defendant bears the burden of raising a reasonable doubt as to whether he harbored a reasonable and good faith but mistaken belief of consent." (*Williams,* at p. 361.) "[I]n determining whether the *Mayberry* instruction should be given, the trial court must examine whether there is substantial evidence that the defendant honestly and reasonably, but mistakenly, believed that the victim consented to sexual intercourse. [¶] ... [¶] Thus, because the *Mayberry* instruction is premised on mistake of fact, the instruction should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (*Id.* at pp. 361–362.)

"The *Mayberry* defense ... permits the jury to conclude that both the victim and the accused are telling the truth. The jury will first consider the victim's state of mind and decide whether she consented to the alleged acts. If she did not consent, the jury will view the events from the defendant's perspective to determine whether the manner in which the victim expressed her lack of consent was so equivocal as to cause the accused to assume that she consented in fact when she did not." (*People v. Romero* (1985) 171 Cal.App.3d 1149, 1155–1156.) In other words, "unless the evidence reveals *some way* to harmonize the conflicting accounts of defendant and prosecutrix through a mistake of fact, so that the jury can evaluate proof relating to defendant's *belief* in consent (as distinguished from his mere *assertion* of consent), the court need not give the reasonable belief instruction sua sponte." (*People v. Rhoades* (1987) 193 Cal.App.3d 1362, 1369–1370.)

The People maintain the trial court did not err because Fuller's defense was actual consent, "not that he was misled by [Doe 2]'s equivocal behavior." "The defense of consent and the *Mayberry* defense are two distinct defenses." (*People v. Romero, supra,* 171 Cal.App.3d at p. 1155.) When the defense is unequivocal consent and the prosecution's evidence is of nonconsensual forcible sex, the *Mayberry* instruction should not be given. (*Williams, supra,* 4 Cal.4th at pp. 362–363.) However, Fuller insists his testimony regarding prior consensual sex with Doe 2, a reconciliation after he "beat [Doe 2] up," and the evidence suggesting she removed her own clothing was substantial

evidence of Doe 2's equivocal conduct that necessitated the *Mayberry* instruction. The record does not contain substantial evidence of equivocal conduct by Doe 2.

Doe 2 testified that, after smoking crack for an hour, Fuller wanted sexual favors, but she refused. Fuller said, "You smoked my shit and now I ain't getting nothing for it." Fuller tried to force Doe 2 to orally copulate him. When she would not, "[h]e got mad. He beat me up. And he did things to me." At trial, she did not remember anything more. However, Doe 2's statements to Tong on the day of the alleged assault were even more unequivocal. After Tong overheard a struggle in the portable toilet, Doe 2 fell out, basically naked and crying hard. Doe 2 told Tong Fuller had knocked her to the ground, hit and kicked her, and demanded oral sex "because [she] owed [him] money for the crack [he] bought." When she refused, Fuller pushed Doe 2 to the ground and put his penis in her mouth. He ripped off most of her clothes, rubbed his penis on her breasts, and then had intercourse with her. Neither Doe 2's testimony, nor Tong's, indicate Doe 2 acted in an equivocal manner that might have led Fuller to believe she consented to the sexual contact.

Likewise, Fuller's testimony does not suggest sufficient equivocal behavior by Doe 2. Fuller's testimony that he and Doe 2 had consensual sex earlier in the day is not dispositive. (See *People v. Simmons* (1989) 213 Cal.App.3d 573, 580–581 ["evidence of the victim's prior sexual conduct with a defendant, by itself, is insufficient to require that the jury be instructed pursuant to CALJIC No. 10.23, because such conduct has no tendency to prove or disprove the defendant's state of mind at the time of the offense" (italics omitted) ].) Fuller also testified that Doe 2 was a prostitute, removed her own clothing inside the portable toilet, wanted to have sex with him, and then agreed to let him rub his penis on her breasts when it was discovered he had no condom. This is evidence that Doe 2 unequivocally consented to sexual activity with Fuller, not that Fuller mistakenly believed she had consented. Because Fuller and Doe 2 presented "wholly divergent accounts [that] create no middle ground" from which Fuller could argue he reasonably misinterpreted Doe 2's conduct as consent, a *Mayberry* instruction was not warranted. (*Williams, supra*, 4 Cal.4th at p. 362).

In *Williams,* our Supreme Court said: "No doubt it would offend modern sensibilities to allow a defendant to assert a claim of reasonable and good faith but mistaken belief in consent based on the victim's behavior *after* the defendant had exercised or threatened 'force, violence, duress, menace or fear of immediate and unlawful bodily injury on the person or another.' [Citations.] However, *a trier of fact is permitted to credit some portions of a witness's testimony, and not credit others. Since a trial judge cannot predict which evidence the jury will find credible,* he or she must give the *Mayberry* instruction whenever there is substantial evidence of equivocal conduct that could be reasonably and in good faith relied on to form a mistaken belief of consent, despite the alleged temporal context in which that equivocal conduct occurred. The jury should, however, be further instructed, if appropriate, that a reasonable mistake of fact may not be found if the jury finds that such equivocal conduct on the part of the victim was the product of 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another.' " (*Williams, supra*, 4 Cal.4th at p. 364, italics added.)

Here, even if the jury believed Doe 2 removed her own clothes and that, despite his later flight, Fuller had a good faith belief Doe 2 consented, Fuller's current theory would nonetheless fail the objective prong of the *Mayberry*

defense. In contrast to the situation anticipated by the *Williams* court, both Fuller and Doe 2 testified that the sexual conduct in the portable toilet came after Fuller "beat her up." Furthermore, during his deposition, Fuller said Doe 2 was crying both immediately before, during, and after that sexual contact. Fuller said it was because of Doe 2's tears that he fled from police. No reasonable person would consider Doe 2's removal of her own clothes, in this context, to constitute consent. The trial court did not err in failing to give the jury a *Mayberry* instruction.

*Fuller*, 2017 WL 1131822 at *23–*24.

### 2. Analysis

A criminal defendant "is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). To obtain habeas relief, a petitioner "must show that the alleged instructional error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Clark*, 450 F.3d at 905 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Petitioner argues that there was substantial evidence to support a *Mayberry* instruction about mistaken belief in consent as a defense to the 2003 sexual offense, pointing to how Doe 2's discarded clothing was hung on a railing and right-side out and challenging Doe 2's credibility. Respondent contends that the state court's determination that there was insufficient evidence to support the *Mayberry* instruction is a factual finding entitled to the presumption of correctness under § 2254(e)(1) on federal habeas review, citing the Ninth Circuit's holding in *Menendez,* 422 F.3d at 1029-30 ("a state trial court's finding that the evidence does not support a claim of imperfect self-defense is entitled to a presumption of correctness on federal habeas review"). Dkt. No. 10-1 at 37. Conflicting Ninth Circuit authority applies the standard of review for an objectively unreasonable application of Supreme Court precedent under § 2254(d)(1) to a claim based on the trial court's failure to give a defense instruction. *See Byrd v. Lewis,* 566 F.3d 855, 860–61 (9th Cir. 2009) ("the California Court of Appeal's ruling regarding failure of the trial court to sua sponte instruct the jury on mistake-of-fact was not contrary to or an unreasonable application of clearly established Federal law."). As *Menendez* governs an instruction on imperfect self-defense and does not squarely apply here, the court

follows *Byrd* to review this instructional error claim under the deferential standard set forth in § 2254(d)(1). *Byrd,* 566 F.3d at 860–61. *See Lambert v. Blodgett*, 393 F.3d 943, 976 (9th Cir. 2004) ("State decisions applying law to facts are governed by § 2254(d)(1); however, factual findings underlying the state court's conclusion on the mixed issue are accorded a presumption of correctness.").

Petitioner further argues that in similar circumstances California caselaw has found an objectively reasonable subjective belief in consent. Dkt. No. 1-2 at 88–91. To the extent that petitioner argues that the state court incorrectly applied state law to the evidence in failing to give the *Mayberry* instruction, this alleged error in the state court's determination of whether state law allowed for an instruction does not state a claim for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("federal habeas corpus relief does not lie for errors of state law"); *Menendez*, 422 F.3d at 1029 ("Any error in [a] state court's determination of whether state law allowed for an instruction . . . cannot form the basis for federal habeas relief.").

The court has carefully reviewed the record and finds that the state court reasonably determined that petitioner failed to present substantial evidence of equivocal conduct that could be reasonably and in good faith relied on to form a mistaken belief in consent; and that the prosecutor presented substantial evidence that any equivocal conduct was the product of force, violence, duress or fear. As the state court noted, it would not be reasonable to believe that Doe 2 removed her own clothing as an indication of consent when, according to Tong's testimony and Doe 2's statements on the day of the alleged assault, she removed her clothing after petitioner beat her up, and after the sexual contact, she fell out of the portable toilet, basically naked and crying hard. RT 486–88, 616–20.

Even assuming arguendo that it was error to not give a *Mayberry* instruction, petitioner has not shown that the error so infected the entire trial that his conviction violated due process. *Henderson*, 431 U.S. at 154. First, the prior bad act was admissible regardless of whether petitioner had a mistaken belief in Doe 2's consent.

41

Second, the *Mayberry* instruction was inconsistent with petitioner's defense theory at trial which was that Doe 2 had consented to the sexual act, RT 677–81, and not that he mistakenly presumed consent from her equivocal behavior. Finally, even if the *Mayberry* instruction caused the jury to disregard the prior bad act, there was still sufficient evidence to support petitioner's conviction on the charged crime. The victim's testimony that petitioner dragged her to an alcove in the parking lot with the intent to rape was credible because it was consistent with her statements to the police at the time of the crime, and corroborated by the testimony of Officer Harris and by her physical injuries. RT 346–48, 397–400, 417–20. Petitioner's defense that he did not have the intent to rape the victim because he didn't want to "fuck her at the McDonald's parking lot" relied on the credibility of his testimony, which was undermined by his admissions that he beat the victim and that he believed that she "owed [him] some pussy," RT 729–30, 746, 754–55, 757. Petitioner has not demonstrated that, in light of the evidence presented at trial, the trial court's failure to give a *Mayberry* instruction related to the prior bad act would have had a substantial or injurious effect in determining the jury's verdict, where the victim's testimony about the relevant events was corroborated by physical evidence and a third-party witness and petitioner's inconsistent statements weakened his own credibility. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### C. Failure to Give Instruction Regarding Petitioner's Unrecorded Out of Court Statement to Police

#### 1. State Court Denial of Claim

The California Court of Appeal denied this instructional error claim as follows:

E. *Failure to Instruct Jury to Treat Fuller's Out of Court Statements with Caution*

Next, Fuller complains that the trial court erred by not giving a cautionary instruction (CALCRIM No. 358) regarding Fuller's out of court statement to a police officer that "[he] first wanted to fuck [Doe 1] because she owed me that, but as I was beating her up, she smelled like piss, so I didn't want to fuck her no more."

Contrary to Fuller's current assertion, Fuller did not deny making this statement. On cross-examination, the prosecutor and Fuller engaged in the following colloquy:

"Q. Do you remember the officer asking you if you were assaulting [Doe 1] and then going to have sex with her? Do you remember him asking about that?

"A. Yes.

"Q. Do you remember saying, quote, 'No, I first wanted to fuck her because she owed me that, but as I was beating her up, she smelled like piss, so I didn't want to fuck her no more'?

"A. Listen, I wanted—

"Q. The question is, did you say that?

"A. *Yes.*" [FN 26] (Italics added.)

> FN 26: The colloquy continued: "Q. So as you are beating her, in the process ... , you were thinking that you wanted [to] fuck her but then you changed your mind?
> "A. No. I wanted to fuck her at the Hacienda Apartments. I didn't want to fuck her at the McDonald's parking lot. I beat her ass. ...
> "Q. That's not what you told the officer.
> "A. That is what I told the officer. He might have wrote it in a different kind of phrase. ... I wanted to fuck her at the [apartment complex where Doe 1 lived]. I didn't want to fuck in no McDonald's parking lot.
> "Q. Did you tell the officer, 'No, I first wanted fuck her because she owed me that, but as I was beating her, she smelled like piss so I didn't want to fuck her no more'?
> "A. Look, you could read that over and over and over again. It doesn't say no location where I wanted to fuck her at. [¶] In my mind, I wanted to fuck her at the [apartment complex]. This shit happened at the McDonald's parking lot. And I got way more sense than trying to fuck a bitch in a parking lot. That just doesn't add up, since you wanted to know. [¶] ... [¶]
> "Q. Didn't you tell him you only changed your mind while you were beating her about wanting to have sex with her?
> "A. No, I didn't. That wasn't in the equation. [¶] ... [¶]
> "Q. Didn't you say that more than once, a portion of that quote?
> "A. To Officer Piexoto?
> " Q. Yes. ... Didn't Officer Piexoto toward the end of the interview explain to you it was coming to the end and he wanted to see if you wanted to say anything further about this. Do you remember that?
> "A. Yes.
> "Q. And your reply, you said, 'That bitch owed me some pussy, but she smelled so bad, I just beat her down'?
> "A. She owed me some pussy.
> "Q. Did you say that?
> "A. Yes, yes, yes. [¶] But in your mind, you think I wanted to have sex with her at the McDonald's. That's not true." During their deliberations, the jury asked for a readback of this testimony.

With respect to only this evidence, Fuller contends the court had a sua sponte obligation to give CALCRIM No. 358. [FN 27] After Fuller's trial, our Supreme Court decided a trial court has no sua sponte duty to instruct with CALCRIM No. 358. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1181, 1189 (*Diaz*).) "[T]he

cautionary instruction is not one of the general principles of law upon which a court is required to instruct the jury in the absence of a request. The cautionary instruction does not reflect a legal principle with which jurors would be unfamiliar absent the instruction, and the defendant may not always want the instruction to be given. Nevertheless, the instruction may be useful to the defense in highlighting for the jury the need for care and caution in evaluating evidence of the defendant's statements. [¶] ... [¶] ... The cautionary instruction on admissions is no longer 'necessary for the jury's understanding of the case' [citation] because courts are now required to instruct the jury, in all criminal cases, concerning the general principles that apply to their consideration of witness testimony." (*Id.* at pp. 1189–1190, italics omitted.)

> FN 27: CALCRIM No. 358 provides: "You have heard evidence that the defendant made [an] oral or written statement[s] (before the trial/while the court was not in session). *You must decide whether the defendant made any (such/of these) statement[s],* in whole or in part. If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement[s]. [¶] [*Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.*]" (Italics added.)

We need not decide the question left open by the *Diaz* court—whether the new rule it announced applies retroactively (*Diaz, supra,* 60 Cal.4th at p. 1195)—because any error in omitting the instruction was harmless in this case. It is not reasonably probable the jury would have reached a more favorable result had the instruction been given. (*Id.* at p. 1195.) The purpose of the cautionary instruction is to assist the jury in determining if the defendant's out of court statement was in fact made. (*Id.* at p. 1184.) It "is concerned with the reliability and credibility of the witness who testifies about the defendant's statements." (*Id.* at p. 1187.) Fuller clearly admitted making the out-of-court statement. Thus, there is no reasonable probability the jury would find that the statement was not made. Although Fuller clearly disputed what the words meant, there was no " 'conflict in the evidence about the exact words used ... or whether the [statements] were repeated accurately.' " (*Id.* at p. 1195.) Finally, the court instructed the jury on how it should determine the credibility of witnesses' statements and testimony and evaluate conflicting evidence. Specifically, the jury was instructed with CALCRIM No. 226, which sets out the numerous factors the jury may consider in deciding whether a witness's testimony is credible, [FN 28] with CALCRIM No. 302 ("Evaluating Conflicting Evidence"), and with CALCRIM No. 318 ("Prior Statements as Evidence"). Thus, the jury was well aware of the need to evaluate witnesses' testimony for possible inaccuracies and determine whether the statement was in fact made. (CALCRIM No. 226.) It is not reasonably probable that had the jury been given CALCRIM No. 358 they would have reached a result more favorable to Fuller.

> FN 28: The jury was instructed: "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe. [¶] In evaluating a witness's testimony, you may consider anything that reasonably tends

to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are: [¶] How well could the witness see, hear, or otherwise perceive the things about which the witness testified? [¶] How well was the witness able to remember and describe what happened? [¶] What was the witness's behavior while testifying? [¶] Did the witness understand the questions and answer them directly? [¶] Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided? [¶] What was the witness's attitude about the case or about testifying? [¶] Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony? [¶] How reasonable is the testimony when you consider all the other evidence in the case? [¶] Did other evidence prove or disprove any fact about which the witness testified? [¶] Did the witness admit to being untruthful? [¶] What is the witness's character for truthfulness? [¶] Has the witness been convicted of a felony? [¶] Has the witness engaged in other conduct that reflects on his or her believability? [¶] Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently. [¶] If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject. [¶] *If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says.* Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest." (Italics added.)

*Fuller*, 2017 WL 1131822 at *25–*26.

### 2. Analysis

To the extent that petitioner argues that the trial court was required under state law to *sua sponte* give a cautionary instruction and that the state court incorrectly applied state law to the evidence, this alleged error under state law does not state a claim for federal habeas relief. *Estelle*, 502 U.S. at 67–68; *Menendez*, 422 F.3d at 1029. Even assuming arguendo that it was error to not give a cautionary instruction, petitioner has not shown that the error so infected the entire trial that his conviction violated due process. *Henderson*, 431 U.S. at 154. The requested instruction (CALCRIM No. 358) cautions the jury that it must decide for itself if the defendant made the out of court statement. As the state court noted, there is no dispute that petitioner made the out of court statement. The failure to instruct the jury with CALCRIM No. 358 did not violate due process. Accordingly, Petitioner is not entitled to habeas relief on this claim.

## IV.    Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

To obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that the first claim of the petition meets that standard, namely, that the trial court erred in overruling objections to the prosecutor's peremptory challenges to two African-American prospective jurors in violation of the Equal Protection Clause under *Batson*.  Accordingly, the court GRANTS a COA as to the *Batson* claim.  As to the remaining claims of the petition, petitioner has made no showing warranting a COA, and so none is granted as to those remaining claims.

## CONCLUSION

1.  The petition for a writ of habeas corpus is **DENIED**.  A certificate of appealability is **GRANTED IN PART AS TO THE *BATSON* CLAIM AND DENIED IN REMAINING PART**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

2.  The clerk shall issue a separate judgment and close the file.

**IT IS SO ORDERED.**

Dated: May 14, 2019

_____
PHYLLIS J. HAMILTON
United States District Judge